# MANN v. DISTRICT OF COLUMBIA.*

---

DEAD ANIMALS, PROPERTY IN; POLICE REGULATIONS, EXTRATERRITORIAL
EFFECT OF.

1. The death of a domestic animal does not terminate the owner's property
   in it, and while he may be required by the municipality to dispose of
   the carcass so that it will not become a nuisance, the municipal au-

---

*Animals.*— As to right of property in dogs, and duties and liabilities
arising out of such right, see editorial note to *Graham* v. *Smith,* 40 L.
R. A. 503, containing a full presentation of the authorities.

thorities cannot arbitrarily deprive him of his property by giving it to another; and the owner is entitled to a reasonable time for its removal, and may remove it by the agency of others, as well as remove it himself, and this includes the right to dispose of it by sale and the removal of it by his vendee (following *Campbell* v. *District of Columbia*, 19 App. D. C. 131).

2. That part of § 9, art. 14, of the police regulations, which requires the owner of the dead animal to remove the carcass within a limited time to a place or places to be approved of by the commissioners, and dispose of it in accordance with a specified system, must be construed to mean that when the owner of the carcass removes it to any place within the District of Columbia and disposes of it there, the place and manner of disposal must be subject to the approval of the commissioner. The regulation has no extra-territorial force, and does not apply when the carcass is removed beyond the District, except where the removal is by the contractor with the District for the removal of garbage and dead animals, who is compelled by his contract to comply with the regulations.

3. The opinion expressed by the court, that if the owner of the dead animal should remove the carcass from the District to a place so close to the border, and dispose of it in such a manner, as to amount to a nuisance to adjacent residents of the District, the offender might be punished under existing or similar municipal regulations.

No. 1289.    Submitted May 5, 1903.    Decided June 2, 1903.

In ERROR to the Police Court of the District of Columbia.

*Reversed.*

The COURT in the opinion stated the case as follows:

The plaintiff in error, Patrick Mann, was prosecuted and convicted in the police court of the District of Columbia, on an information, whereby he was charged with transporting a dead horse through the streets of the city of Washington, and across the Long bridge over the Potomac river to a place in the State of Virginia, near the Potomac river, about 2 miles south of said Long bridge, in alleged violation of one of the municipal regulations of the District of Columbia. The municipal regulation in question is the following:

"Article 14, § 9. It is hereby made the duty of the contractor with the District of Columbia for the collection and removal of

garbage and dead animals, to collect and remove, in accordance with the regulations and contract of said District, all garbage, dead animals, fish, and refuse animal and vegetable matter found within the District, to some place to be designated or approved by the commissioners of the District, and to dispose of the same through a reduction or consumption process, subject to the sanitary inspection and approval of said commissioners; and each cart or other vehicle used for the purpose of removing garbage shall have the word "garbage" and the number of the wagon in large white letters on a black ground plainly printed or attached to each side of the wagon bed, which shall be of metal, watertight, and provided with tight-fitting covers, and be approved by the superintendent of street cleaning. All dead animals shall be removed to the place of disposal in covered wagons or other vehicles or conveyances as nearly air-tight as possible, to be approved by the superintendent of street cleaning; and it shall be unlawful for any person to use for the removal of garbage or dead animals any cart, wagon, vehicle, or other conveyance not so approved.

"No other person or party except the District contractor, his, their, or its agents, shall carry, convey, or transport through the streets, alleys, or public places of the said District, any garbage, dead animals, fish, or refuse animal or vegetable matter; and it shall be unlawful for any person to interfere in any manner with the collection and disposal of such materials or dead animals by the District contractor, his, their, or its agents or employees: *Provided* that the owner of any dead animal, if the same shall have died upon private premises, may remove the same or cause it to be removed within four hours after it shall have died; otherwise such removal shall be within one hour thereafter, to a place or places to be approved by the commissioners of the said District, whence it shall be taken and disposed of by the reduction process, subject to the sanitary inspection of the said commissioners.

"All garbage, dead animals, night soil, miscellaneous refuse, and ashes must be within the digesting tanks or the furnace, or otherwise in the process of actual disposal, not later than 6 o'clock A. M. on the day following the day of their receipt by the con-

tractor or other person for such disposal. All such garbage, dead animals, and night soil must be completely disposed of within twenty-four hours, and all miscellaneous refuse and ashes within seventy-two hours, after their receipt.

"The capacity of any plant or scheme established by any contractor or other person must be sufficient to enable all necessary repairs to be made without interfering with the work of disposal."

The case was tried in the police court without a jury under an agreed statement of facts, which statement, as taken from the record, is the following:

"The defendant is now and has been for about twenty years, among other businesses carried on by him, engaged in the business of collecting dead animals in the District of Columbia and manufacturing or having them manufactured into fertilizers; and he is fully equipped for the prompt removal of dead animals, having covered wagons as near air-tight as possible for the purpose, as required by the police regulations of the District.

"On the 20th day of January, 1903, the defendant purchased the carcass of a dead horse from the owner thereof, for which he gave the sum of $1 at the stable of one Robinson, numbered 222 C street northwest, in the city of Washington, District of Columbia. Said carcass was worth to the defendant for the purpose to which he put it the sum of about $8. Said horse died on said premises, which are the private premises of said Robinson. Said horse died about 8:15 o'clock in the morning of the said day, and was loaded into the wagon of the defendant for removal not later than half-past 9 o'clock in the morning of the same day. Said defendant on said day hauled the said carcass in his wagon along Pennsylvania avenue, Seventh and other streets, in the city of Washington, District of Columbia, and across the Long bridge to a place in Virginia near the Potomac river about 2 miles south of said Long bridge, where there is a factory where dead animals are manufactured into fertilizers and soap and other productions. Said defendant caused said dead animal to be so disposed of at said factory. The defendant, at the time he removed said dead animal, was not the public contractor with the District of Columbia for the collection and removal of garbage or dead ani-

mals, nor was the dead animal removed by him as aforesaid taken
to a place of disposal approved by the commissioners of the District of Columbia.    Said defendant did not, nor did any one else,
at any time prior to the removal of said animal, or subsequently,
apply to the commissioners of the District of Columbia to approve said place and manner of disposal.    The process of disposal at said place is a reduction process, but is not of the sanitary kind that is now in general use for such purposes in or near
all large cities, and the work of reduction there carried on is not
under the sanitary inspection and approval of the said commissioners, and they have not been requested to give it such inspection and approval.

"The commissioners of the District of Columbia, prior to the
11th day of October, 1899, advertised as required by law, for
proposals for the collection, removal, and disposal of all garbage
and dead animals in the District of Columbia, which advertisement required each bidder to submit with his bid a full description of the scheme of disposal by the reduction or consumption
process which he proposed to establish and maintain, the plant,
fixtures, and means of transportation whereof was to be at the
expense of the contractor; and the Washington Fertilizer Company being the lowest bidder therefor, the said commissioners, on
the 11th day of October, 1899, entered into a contract with it,
which contract, among other things, provides for the removal by
said fertilizer company of all garbage and dead animals, such as
are referred to in the foregoing police regulations, produced and
found in the District of Columbia, for the period of five years
from the date of said contract under the terms and conditions set
forth in said police regulations and said contract.    Said contract
provides that the said fertilizer company shall have all the garbage and dead animals produced and found in the District of
Columbia during that period for its own use and benefit; and the
contract price to be paid by the District to said contractor for
such service was considerably reduced in consideration of the receipt by it of such garbage and dead animals from what it would
otherwise have been.

"Said fertilizer company is equipped with the necessary

wagons, boats, and other means of transportation, and a plant adequate to the removal and disposal of all such garbage and dead animals. Its plant is a sanitary one of the most modern and approved method and system. It is located in Virginia, and is under the sanitary inspection and control of the commissioners of the District of Columbia by virtue of the terms of the contract aforesaid, and is so carried on and managed that it emits no offensive or unwholesome odors whatever."

Upon this agreed statement of facts, the police court was requested by the counsel for the defendant to rule as matter of law: (1) That the regulation in question did not apply to the dead animal which the defendant was charged with removing; (2) that neither the contract between the commissioners and the Washington Fertilizer Company, nor the law, gives said company the right to remove and convert to its own use all dead animals in the District of Columbia to the exclusion of the owner's rights thereto; (3) that inasmuch as the dead animal in question was taken out of the District of Columbia by the defendant, it was immaterial whether it was taken to a place designated by the commissioners of said District or was disposed of by a reduction or consumption process under the sanitary inspection of said commissioners; (4) that the defendant was not guilty of any offense and should be discharged.

But the court refused so to rule, and found the defendant guilty; and upon bill of exceptions duly reserved the latter has been allowed a writ of error for the review of his case in this court.

*Mr. S. T. Thomas* and *Mr. J. A. O'Shea* for the plaintiff in error.

*Mr. A. B. Duvall, Corporation Counsel,* and *Mr. E. H. Thomas, Assistant,* for the defendant in error.

Congress has conferred full power and authority upon the commissioners to make regulations in relation to the disposal of dead animals, in direct and explicit terms, and also by authorizing

them to make and amend ordinances in relation to the preservation of the health and comfort of the community. Indeed, there can be no doubt but that Congress has conferred upon the District commissioners all the police power it could itself exercise in the District of Columbia in relation to the removal of garbage and dead animals, which is coextensive with that which can be exercised by any legislature in any state. *Lansburg* v. *D. C.* 11 App. D. C. 512.

1. The sole question in this case is whether the act of Congress of June 6, 1900, is valid. Upon the question of whether the public authorities, in the exercise of the police power, may prohibit the owner of a dead animal from removing it and authorize the said authorities or a public contractor of the city to do so and convert it to public use, the decided cases where that exact question has been in issue present some conflict. It is believed that the following cases are all in this country, where the exact question was raised and determined: *Knaurer* v. *Louisville* (Ky.) 45 S. W. 510; *Louisville* v. *Wibble & Willinger* and *Wibble & Willinger* v. *Strauss & Company,* 84 Ky. 290; *Smiley* v. *McDonald,* 42 Neb. 5; *In the Matter of Lowe,* 54 Kan. 757; *State* v. *Fisher,* 52 Mo. 174; *River Rendering Company* v. *Behr,* 7 Mo. App. 345; Same case reversed, 77 Mo. 91; *Alpers* v. *San Francisco,* 32 F. R. 503; *National Fertilizer Company* v. *Lambert,* 48 F. R. 458; *Schoen Bros.* v. *Atlanta,* 97 Ga. 697; *Underwood* v. *Green,* 42 N. Y. 140; *Meyer* v. *Jones* (Ky.) 49 S. W. 809; *State* v. *Morris,* 47 La. Ann. 1660; *Walker* v. *Jameson,* 140 Ind. 591; *Campbell* v. *District of Columbia,* 19 App. D. C. 131. Of the fourteen cases cited, seven of them held such regulation valid and the others held the contrary. But in three of the cases where the regulation was held invalid, or as not applying to the particular case, it appeared that the person prosecuted was removing large quantities of dead animals, which came into stock yards dead upon trains or died there afterwards, and the language of the courts in the opinions in those cases may fairly be construed as holding that the regulation was not intended to apply to such case, but only to cases where the animal died in or near the streets of the city and belonged to individual

owners. This is especially true of the cases in the 77th Missouri and 42d New York. But each of the cases above cited shows that the city authorities have the right to prescribe the time, manner, and means of such removal.

2. Proper sanitary conditions at the present day demand that the public authorities may not only prescribe the time, manner, and means of removal of carcasses of dead animals, but also the method of disposal.

As said by the Supreme Court of the United States and this court, law is a progressive science, and matters which half a century ago would not probably have fallen within the purview of the police power may, from changed conditions of society, be now imperatively included therein. The following references to cases in the Supreme Court of the United States show the correctness of this assertion. The same cases also show that where a subject-matter is fairly within the purview of the police power the manner of dealing with it is entirely within the discretion of the legislative power, and the courts have no jurisdiction to interfere. *Holden* v. *Hardy*, 169 U. S. 366; *Powell* v. *Pennsylvania*, 127 U. S. 678; *Louisville & Nashville Railroad* v. *Kentucky*, 161 U. S. 700; *Smith* v. *St. Louis and Southwestern Ry. Co.* 181 U. S. 248; *Lawton* v. *Steele*, 152 U. S. 133; *Chicago, Burlington, etc., R. R. Co.* v. *Chicago*, 166 U. S. 255; *Dupont* v. *The District of Columbia*, 20 App. D. C. 477; *Moses* v. *United States*, 16 App. D. C. 428, 437, 438.

3. It is a violation of the regulation for plaintiff in error to purchase the carcasses after death and remove them. The ordinance simply permits the owner to make the removal. It does not contemplate that the owner may sell to some person who makes a business of buying and removing such carcasses. Such a business is in contravention of the spirit of the act of Congress, unless under the inspection and control of the commissioners of the District. *City of Louisville* v. *Wible*, and *Willinger* v. *Strauss & Co.* 84 Ky. 290; *State* v. *Morris*, 47 La. Ann. 1660. The fact that plaintiff in error removes the carcasses beyond the District makes no difference. *City of Hillsboro* v. *Ivey*, 1 Tex. Civ. App. 653; *Seacord* v. *The People*, 121 Ill. 623.

Mr. Justice Morris delivered the opinion of the Court:

There is no substantial difference between this case and that of *Campbell* v. *District of Columbia,* 19 App. D. C. 131, which was decided on December 4, 1901, and wherein it was held that the death of a domestic animal does not terminate the owner's property in it, and while he may be required to dispose of the carcass so that it will not become a nuisance, the municipal authorities cannot arbitrarily deprive him of his property by giving it to another; that the owner is entitled to a reasonable time for its removal; that he may remove it by the agency of others as well as by himself; and that this includes the right to dispose of it by sale, and the removal of the dead animal by the vendee. We see no reason under existing conditions to depart from that ruling. If conditions that may arise in the future should require or suggest a modification of it, it will be time to consider such conditions when they actually arise.

There is only one question involved in the present case which was not involved in the case of *Campbell* v. *District of Columbia,* and that is, whether the police regulation which has been cited, in so far as it provides for the removal of dead animals to a place to be designated or approved by the commissioners, and for the disposal of such animals there in accordance with a certain specified system, is applicable to the plaintiff in error for his removal of a dead animal to a place in the State of Virginia not designated or approved by the commissioners and for his disposal of it there in a manner not approved by them. And this question in the present case is not difficult of solution; for it is very plain that the commissioners of the District of Columbia are without authority of law to control the plaintiff in error in the disposition which he makes of his property outside of this District. It is not contended that he may not lawfully remove it out of the District; and if he may lawfully remove it beyond the jurisdiction, it is difficult to see how the commissioners can lawfully determine what he shall do with it after it has been so removed. This is ·a question for the State of Virginia or for the local authorities of the county or district in that State to which the dead body has

been removed, and not for the commissioners of the District of Columbia.

The regulation, therefore, under which this prosecution has been had must be construed to mean that when a person removes a dead animal to any place within the District of Columbia and disposes of it there, the place and manner of disposal must be subject to the approval of the commissioners of the District. The regulation cannot be allowed any extraterritorial force, except in the case of the contractor with the District, who is bound by his contract to comply with the law and the regulation. It is not applicable to the individual citizen who removes his property beyond the jurisdiction.

Of course, it may be conceded that the authorities of the State of Virginia may prohibit such removal into their State or county, and may regulate the disposal of the dead body there, if they do permit the removal. And it may also be conceded that the Congress of the United States in proper cases, either by virtue of its plenary power of legislation over the District of Columbia or under its authority to regulate commerce between the States, may regulate the matter of the removal of the dead bodies of animals from the District of Columbia. But there is no question here of anything of this kind. The place selected by the contractor and approved by the commissioners is itself in the State of Virginia. The power of removal cannot be conceded to the one and denied to the other.

We do not mean to be understood here as holding that if one moves the dead body of an animal from the District of Columbia to some place in the adjacent States of Maryland and Virginia, and there disposes of it in such manner as that it becomes a nuisance to the adjacent residents of this District, as when, for example, the place is so close to the border, and the manner of disposal generates odors offensive to the whole neighborhood, the offender may not be punished under the present or some similar regulation. On the contrary, we think he could and should be reached by proper regulation, even though there has been an actual physical removal of the dead body from the District. But no such case is presented here. There is a suggestion in argu-

ment that the place selected by the plaintiff in error for the disposal of the dead body here in question is so near to the Potomac river that persons passing upon the river may be offended by the noisome odors arising therefrom; and there is a possibility likewise that such noisome odors and effluvia may be wafted across the river into the District of Columbia and the city of Washington. But there is no proof whatever of the existence of any such conditions, and no proof that such conditions are likely to exist. Their mere possibility cannot here be taken into consideration.

We are of opinion that there was error in the ruling of the police court. The judgment will be *reversed, and the cause remanded to that court with directions to discharge the plaintiff in error. And it is so ordered.*

A writ of error to the Supreme Court of the United States was prayed by the defendant in error and allowed June 26, 1903.