**DARLING DELAWARE CORPORATION, Appellant,**

v.

**DISTRICT OF COLUMBIA, Appellee.**

**No. 11691.**

District of Columbia Court of Appeals.

Argued Nov. 8, 1977.

Decided Dec. 9, 1977.

---

James E. Rocap, III, Washington, D. C., for appellant; William H. Jeffress, Jr., Washington D. C., was on the briefs.

Margaret L. Hines, Asst. Corp. Counsel, Washington, D. C., with whom John R. Risher, Jr., Corp. Counsel, Louis P. Robbins, Principal Deputy Corp. Counsel, and Richard W. Barton, Deputy Corp. Counsel, Washington, D. C., were on the brief, for appellee.

Before KELLY, KERN and HARRIS, Associate Judges.

HARRIS, Associate Judge:

Appellant was convicted of transporting solid waste without a license in violation of the Solid Waste Disposal Regulations. 6A D.C.R.R. § 8–3:606(a) (1971).[1] The trial court imposed a fine of $75. Appellant contends that the trial court erred in concluding that the meat fat and bones which were transported by appellant were "solid waste" within the meaning of the Regulations. We agree and reverse.

A violation notice was issued by a Metropolitan Police officer to one of appellant's employees for transporting meat fat and bones in the District of Columbia without a license. Thereafter, the corporate employer was substituted as the defendant. At trial, appellant introduced testimony establishing that the transported materials (which essentially are by-products of the processing of regular cuts of meat for retail sale) regularly are purchased by appellant from grocery stores and markets in Maryland, Virginia, and the District of Columbia. The materials (which have been frozen by the sellers) then are transported in plastic containers in nonrefrigerated, enclosed trucks to a depot in Maryland. Following shipment from the depot to New York, the bulk of these materials are processed into tallow, a basic component of cosmetics, plastics,

soap, and other products.[2] Some of the materials are used as soup bones or as ingredients in the production of margarine and lard.

Appellant introduced evidence reflecting the fact that the professional market for meat fat and bones is competitive. Also, grocery stores sell some (a small percentage) of their fat and bones directly to their retail customers for use as pet food and soup bones.

The Solid Waste Disposal Regulations are designed "to establish minimum standards for the storage, collection, transportation and disposal of solid wastes, and thus promote the health, safety and welfare of the people of the District of Columbia." Solid Waste Disposal Regulations, § 8–3:601(a). The trial court found that the materials in question constituted "food waste" within the meaning of the Regulations. "Food Waste (Garbage)" is defined in § 8–3:602 as

> animal and vegetable waste resulting from the storage, handling, preparation cooking or serving of foods.

The term "Waste" is more specifically defined in § 8–3:602 as

> useless, unwanted, or discarded materials resulting from normal community activities. Wastes include solids, liquids, and gases. Solid wastes are classed as refuse.

The trial court concluded that the fat and bones were not worthless commodities, but that they nonetheless were "discarded materials" resulting from the preparation of foods.

The term "discard" is defined in Webster's Third New International Dictionary (1971) as "to get rid of as no longer useful [or] valuable." It "indicates dispensing with, letting go of, getting rid of as not immediately useful." In *Dupont v. District of Columbia*, 20 App.D.C. 477 (1902), the

---

1. While both the complaint and the trial court's "Finding of Facts and Order" refer to a violation of § 8–3:604(a), the case was tried on the basis that a violation of § 8–3:606(a) was at issue. Section 8–3:606(a) is the appropriate reference, and the trial court later amended its order to so read.

2. The pickups from grocery stores begin at approximately 7:00 a.m. Delivery at the depot usually occurs around 3:00 p.m. on the same day. Shipment to New York is made that evening in order to forestall excessive decomposition of the materials.

Court of Appeals of the District of Columbia examined similar regulations on the collection and disposition of garbage, and observed that "all matter which may be laid aside, merely in the preparation of dishes for the table, is [not] necessarily garbage."[3] *Id.*, at 488–89. That court pointed out that meat trimmings and the like are capable of unobjectionable uses.

In *Nash v. District of Columbia,* 28 App. D.C. 598 (1907), the same court held that grease and cracklings which were purchased from a hotel by a company engaged in the manufacturing of grease and tallow did not constitute garbage. Among the factors which entered into the decision in *Nash* were (1) the separation of the grease and cracklings from other materials which were placed in garbage cans, (2) the cooking and carrying away of those products within 24 hours, and (3) the inoffensive nature of those products following the cooking process.

In the instant case, the grocery stores did not discard the meat fat and bones, but placed them in plastic containers in their freezers. While appellant's trucks are not refrigerated, they are enclosed and the materials are transported in the same plastic containers. There was no evidence indicating that any offensive odor emanated from the trucks. While the meat fat and bones are subject to decomposition and could cause a health hazard if not properly stored and handled, that exigency also could arise with many foodstuffs. The Regulations do not apply to any substance which could create a health hazard if improperly handled; they apply only to those substances which constitute waste. The products in question do not fall within that category.

At no point in the chain of purchase and sale of these animal by-products were they ever discarded. The record reflects that they were either sold by grocery stores directly to a few retail customers or frozen for sale to large buyers such as appellant.[4] Appellant promptly transported them to plants in New York where they were resold for processing into other useful products. Since these materials never were thrown away as not immediately useful, they cannot be said to have constituted waste, and hence their transportation was not subject to control under the existing regulations. The conviction must be vacated.

*Reversed and remanded with directions to enter a judgment of acquittal.*

---

3. Those regulations were promulgated by the Commissioners of the District of Columbia under the District Appropriation Act of June 6, 1900. The word "garbage" then was defined as "the refuse of animal and vegetable foodstuffs." *Dupont v. District of Columbia,* 20 App.D.C. 477, 479 (1902).

4. These materials were not combined with other materials which did constitute garbage. Therefore, they could not have been characterized as garbage even for a temporary period.