*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

**DISTRICT OF COLUMBIA COURT OF APPEALS**

No. 19-SP-553

IN RE PROSECUTION OF NICCO SETTLES.

On Certification from the Superior Court
of the District of Columbia
(CMD-3451-19)

(Hon. Patricia A. Broderick, Trial Judge)

(Argued September 18, 2019                    Decided October 24, 2019)

*Mitchell Schwartz* for defendant Settles.

*Anne Y. Park*, Assistant United States Attorney, with whom *Jessie K. Liu*, United States Attorney, and *Elizabeth Trosman* and *Jeffrey A. Wojcik*, Assistant United States Attorneys, were on the brief, for the United States.

*John D. Martorana*, Assistant Attorney General, with whom *Karl A. Racine*, Attorney General for the District of Columbia, *Loren L. AliKhan*, Solicitor General, and *Rosalyn Calbert Groce*, Deputy Solicitor General, were on the brief for the District of Columbia.

Before EASTERLY and MCLEESE, *Associate Judges*, and OKUN, *Associate Judge of the Superior Court of the District of Columbia.*[*]

MCLEESE, *Associate Judge*:  The United States Attorney for the District of

Columbia charged defendant Nicco Settles with violating a D.C. Code provision

---

[*]  Sitting by designation pursuant to D.C. Code § 11-707(a) (2012 Repl.).

prohibiting unauthorized disposal of solid waste. D.C. Code § 8-902(a) (2013 Repl.). Mr. Settles argues that he can be prosecuted for that offense only by the Office of the Attorney General (OAG) on behalf of the District of Columbia. The United States and the District of Columbia both take the position that the offense is properly prosecuted by the United States. The trial court properly certified that issue to this court. D.C. Code § 23-101(f) (2012 Repl.). This court must "hear and determine the question in a summary way." *Id.* We conclude that the offense is properly prosecuted by the District of Columbia.

## I. Background

For over a hundred years, the authority to conduct criminal prosecutions in the District of Columbia has been divided between the United States and the local government of the District of Columbia. *In re Crawley*, 978 A.2d 608, 610 (D.C. 2009) (citing An Act To establish a code of law for the District of Columbia, ch. 854, § 932, 31 Stat. 1189, 1340-41 (1901)). The boundaries of that division are established by D.C. Code § 23-101. *Id.* That section has a number of provisions allocating prosecutorial authority between the United States and the District of Columbia. *Id.* This case requires us to focus primarily on one: a provision that

grants the District of Columbia authority to prosecute violations of "police or municipal ordinances or regulations." D.C. Code § 23-101(a).

The provision under which Mr. Settles has been charged, D.C. Code § 8-902(a), was originally enacted by the Council of the District of Columbia in 1994. Illegal Dumping Enforcement Act of 1994, D.C. Law 10-117, § 3, 41 D.C. Reg. 524, 525 (1994). In its current form, § 8-902(a) reads as follows:

> It shall be unlawful for any person to dispose or cause or permit the disposal of solid waste, hazardous waste, or medical waste in or upon any street, lot, park, public place, or any other public or private area, whether or not for a commercial purpose, unless the site is authorized for the disposal of solid waste, hazardous waste[,] or medical waste by the Mayor.

Violations of § 8-902 for a commercial purpose or involving knowing disposal of hazardous or medical waste are felonies carrying a maximum penalty of a fine of $40,000 and imprisonment for five years. D.C. Code § 8-902(b)(2)-(4). All of the participants in this case agree that such felony prosecutions must be brought by the United States. *See, e.g.*, *In re Crawley*, 978 A.2d at 614 (discussing statement in legislative history of Congress's 1970 amendments to D.C. Code § 23-101 that "the United States Attorney would continue to prosecute all felonies and the more serious misdemeanors") (internal quotation marks omitted).

Mr. Settles has not been charged with committing the offense for a commercial purpose or with knowingly disposing hazardous or medical waste, however, and it appears to be undisputed that this would be Mr. Settles's first violation of § 8-902. The offense charged in this case therefore is a misdemeanor carrying a maximum penalty of a fine of $5,000 and imprisonment for ninety days. D.C. Code § 8-902(b)(2). Our holding in this case is limited to such violations.

## II. Discussion

Whether this misdemeanor prosecution is for a violation of a police or municipal ordinance or regulation within the meaning of § 23-101(a) is a question of statutory interpretation. We decide that question de novo. *Williams v. Kennedy*, 211 A.3d 1108, 1110 (D.C. 2019). "The first step in construing a statute is to read the language of the statute and construe its words according to their ordinary sense and plain meaning." *Chase Plaza Condo. Ass'n v. JPMorgan Chase Bank, N.A.*, 98 A.3d 166, 172 (D.C. 2014) (internal quotation marks omitted). We interpret statutory language in light of the historical context in which the statute was enacted. *See, e.g.*, *Perrin v. United States*, 444 U.S. 37, 42 (1979) (in interpreting statutory term, Court looks to meaning of term at time statute was enacted). "We also consider statutory context and structure, evident legislative purpose, and the potential

consequences of adopting a given interpretation." *Williams*, 211 A.3d at 1110. "We may also look to the legislative history to ensure that our interpretation is consistent with legislative intent." *Id.* (internal quotation marks omitted). In interpreting a statute, we are bound by the holdings of our prior decisions interpreting the statute. *Doe by Fein v. District of Columbia*, 697 A.2d 23, 30-31 (D.C. 1997).

## A. Ordinary Meaning

We turn first to the ordinary meaning of the phrase "police or municipal ordinances or regulations." To a modern ear, "police" most immediately suggests law-enforcement officers. *See, e.g.*, *Black's Law Dictionary* 1344 (10th ed. 2004) (defining "police" to mean "**1**. The governmental department charged with the preservation of public order, the promotion of public safety, and the prevention and detection of crime. **2.** The officers or members of this department."). "Police" can have a far broader scope, however. For example, in phrases such as "police power" it can refer to "[t]he inherent and plenary power of a sovereign to make all laws necessary and proper to preserve the public security, order, health, morality, and justice." *See, e.g.*, *id.* at 1345. "Municipal" is generally understood to mean "[o]f, relating to, or involving a city, town, or local government unit." *See, e.g.*, *id.* at 1175. "Ordinance" is defined as "[a]n authoritative law or decree; specif., a

municipal regulation, esp. one that forbids or restricts an activity. • Municipal governments can pass ordinances on matters that the state government allows to be regulated at the local level." *See, e.g.*, *id.* at 1273. Finally, "regulation" nowadays naturally brings to mind rules promulgated by administrative agencies. *See, e.g.*, *id.* at 1475 (defining "regulation" to mean, inter alia, "[a]n official rule or order, having legal force, usu. issued by an administrative agency"). Nevertheless, the term is in some contexts understood to include legislative enactments. *See, e.g.*, D.C. Code § 47-802(6) (2015 Repl.) (defining "regulation" to include certain acts "enacted" by Council of District of Columbia); *Olson v. Molacek Bros. of Calloway, Minn.*, 341 N.W.2d 375, 378 (N.D. 1983) ("The term 'state and federal regulations' necessarily includes statutes in addition to any rules.").

Considered in isolation, the phrase "police or municipal ordinances or regulations" thus could potentially include all legislative acts and administrative rules of the District of Columbia local government. Both the structure of § 23-101 and our case law interpreting that provision indicate, however, that the phrase must be read more narrowly.

## B.  Statutory Structure

Section 23-101(b) specifies the appropriate prosecutor for certain particular offenses.  Otherwise, § 23-101 divides criminal offenses into three general categories:  violations of "police or municipal ordinances or regulations," which are prosecuted by the District of Columbia, § 23-101(a); violations of "penal statutes in the nature of police or municipal regulations," which are prosecuted by the District of Columbia as long as the "maximum punishment is a fine only, or imprisonment not exceeding one year," but not both, *id.*; *District of Columbia v. Moody*, 304 F.2d 943 (D.C. Cir. 1962) (per curiam); and all others, which (subject to specific statutory exceptions) are prosecuted by the United States, D.C. Code § 23-101(c).  Thus, determining the appropriate prosecutor for an offense often requires distinguishing between "police or municipal ordinances or regulations" and "penal statutes."

Drawing that distinction is not a simple task, because the phrase "penal statutes" considered in isolation could also be understood very broadly, to reach all provisions imposing criminal penalties.  *See, e.g.*, *Black's Law Dictionary* 1313 (defining "penal" to mean "[o]f, relating to, or being a penalty or punishment, esp. for a crime"), 1633 (defining "statute" to mean "[a] law passed by a legislative body; specif., legislation enacted by any lawmaking body, such as a legislature,

administrative board, or municipal court"); *Brady v. Ralph M. Parsons Co.*, 609 A.2d 297, 305 (Md. 1992) (for purposes of certain sections in Restatement (Second) of Torts, term "statute" "is intended to include ordinances and administrative regulations").

On the other hand, the term "statute" is more typically understood to exclude administrative regulations. *See, e.g.*, *United States v. Mersky*, 361 U.S. 431, 437 (1960) ("An administrative regulation, of course, is not a statute.") (internal quotation marks omitted). Moreover, courts -- including this court -- have in some contexts distinguished between statutes and municipal ordinances. *See, e.g.*, *Newspapers, Inc. v. Metro. Police Dep't*, 546 A.2d 990, 990-1001 (D.C. 1988) (provision adopted by Board of Commissioners of District of Columbia was ordinance rather than statute, for purposes of District of Columbia Freedom of Information Act, because Board of Commissioners had "regulatory powers," rather than statutory powers later conferred on Council of the District of Columbia pursuant to Home Rule Act (now codified at D.C. Code § 1-201.01 et seq. (2016 Repl.))).

Because § 23-101 distinguishes between "police or municipal ordinances or regulations" and "penal statutes," neither of those phrases can reasonably be read so expansively as to swallow up the other. Beyond that, the structure of § 23-101

provides limited guidance about the scope of either phrase. Fortunately, we do not write on a blank slate, because the courts of this jurisdiction have in several prior cases decided whether particular provisions were or were not "police or municipal ordinances or regulations" for purposes of § 23-101(a). *E.g.*, *In re Hall*, 31 A.3d 453 (D.C. 2011). Those cases have not formulated a unitary conceptual test for distinguishing between police or municipal ordinances or regulations and penal statutes. Rather, we have identified a number of relevant but not necessarily dispositive factors to be considered in determining which category applies to a given offense. We address those factors in turn.

### C.  Local Regulation or General Prohibition

In construing § 23-101(a), we have said that "[a] municipal ordinance or police regulation is peculiarly applicable to the inhabitants of a particular place." *In re Monaghan*, 690 A.2d 476, 478 (D.C. 1997) (ellipsis and internal quotation marks omitted). We have contrasted such provisions, "designed to regulate . . . in accordance with the requirements of local conditions," with provisions that "deal[] with a subject matter general in character" and are "designed absolutely to prohibit." *Id.* (emphasis and internal quotation marks omitted). This consideration points in

favor of a conclusion that the offense charged in this case is a violation of a police or municipal ordinance or regulation.

District of Columbia law does not absolutely prohibit the disposal of solid waste but rather regulates such disposal, specifying how, where, and by whom such waste is to be collected, transported, stored, and processed. 21 DCMR § 700 et seq. (2019). D.C. Code § 8-902(a) makes it an offense to dispose of solid waste at a location that has not been authorized by the Mayor. Violation of that provision can be the basis for criminal prosecution or for imposition of civil penalties. D.C. Code § 8-902(b), (c).

Section 8-902 thus fits comfortably in the category of provisions that "regulate . . . in accordance with the requirements of local conditions." *In re Monaghan*, 690 A.2d at 478. The District of Columbia argued to the contrary in its brief but appeared to agree at oral argument that § 8-902 operates as a local regulation rather than an absolute prohibition. In any event, we are not persuaded by the argument in the District of Columbia's brief. It is true that § 8-902(a) absolutely prohibits illegal disposal of solid waste. That is at bottom a circular point, however, because criminal provisions by definition prohibit whatever they make illegal. The relevant point is that § 8-902 prohibits solid-waste disposal at certain locations in the District of

Columbia (those not authorized by the Mayor) and permits solid-waste disposal at other locations in the District of Columbia (those authorized by the Mayor). Section 8-902 is thus explicitly tied to local conditions.

### D. History of Regulation and Enforcement

In construing § 23-101, we have also considered whether the District of Columbia or the United States has historically regulated and prosecuted the conduct at issue. *See, e.g.*, *In re Hall*, 31 A.3d at 457 (in holding that offenses of possession of unregistered firearm (UF) and unlawful possession of ammunition (UA) are under prosecutorial authority of District of Columbia, court relies on "the District's long history of firearms regulation"); *In re Monaghan*, 690 A.2d at 479 (in holding that solicitation for purpose of prostitution is under prosecutorial authority of United States, court relies on fact that United States had prosecuted such conduct since 1935). This consideration also points in favor of a conclusion that the offense charged in this case is a violation of a police or municipal ordinance or regulation.

The history of waste regulation by the local government of the District of Columbia traces back at least to the early 1800s. *See, e.g.*, Andrew Rothwell, *Laws of the Corporation of the City of Washington* 29 (1833) (1803 provision enacted by

the City Council of Washington imposing penalties for failure to remove "all fish or other offensive substances, or nuisances or obstructions"); *Corporation Laws of the City of Washington* 159-60 (James W. Sheahan comp., 1853) (1853 provision enacted by Board of Aldermen and Board of Common Council of city of Washington imposing penalties for violations of rules relating to rubbish); 1 *Supplement to the Revised Statutes of the United States* 304 (William A. Richardson ed., 1891) (1875 ordinance imposing penalties for violations of rules relating to filth and other offensive substances detrimental to health).

In 1887, Congress authorized the Commissioners of the District of Columbia to "make . . . usual and reasonable police regulations" on various topics, including litter on streets or sidewalks. 24 Stat. 368, 368-69, ch. 49, § 1 (1887) (now codified as amended at D.C. Code § 1-303.01 (2016 Repl.)). In 1892, Congress more generally authorized the Commissioners of the District of Columbia to "make . . . usual and reasonable police regulations" as deemed "necessary for the protection of lives, limbs, health, comfort and quiet of all persons and the protection of all property within the District of Columbia." 27 Stat. 394, Res. No. 4, § 2 (1892) (now codified as amended at D.C. Code § 1-303.03 (2016 Repl.)). Finally, in 1895, Congress authorized the Commissioners of the District of Columbia to "make necessary regulations for the collection and disposition of garbage in the District of Columbia,

and to annex to said regulations such penalties as will secure the enforcement thereof." 28 Stat. 744, 758, ch. 176 (1895) (codified as amended at D.C. Code § 6-501 (1995 Repl.); repealed by Sustainable Solid Waste Management Amendment Act of 2014, D.C. Law 20-154, § 301(a), 61 D.C. Reg. 9971, 9988 (2014), 62 D.C. Reg. 3600 (2015)).

At some point before 1902, the Commissioners of the District of Columbia adopted "[e]laborate regulations" governing the treatment of waste. *Dupont v. District of Columbia*, 20 App. D.C. 477, 479 (D.C. Cir. 1902). By 1906, the District of Columbia's waste regulations had been made part of the "Police Regulations of the District of Columbia," which was an extensive collection of local regulations promulgated by the Commissioners of the District of Columbia. *Police Regulations of the District of Columbia* 66-69 (Gibson Bros. 1906). Those regulations provided for a criminal penalty of a fine of up to $40. *Id* at 69. It appears to be undisputed that the substantial role of the District of Columbia local government in the regulation of waste has continued without interruption to the present day. *See, e.g.*, *Police Regulations of the District of Columbia* 108-12 (1940); 6A DCRR § 8:3-601 et seq. (1971); 21 DCMR § 700 et seq. (2019).

In 1986, the Council of the District of Columbia eliminated the criminal penalties that had been applicable to violations of the waste regulations. Litter Control Administration Act of 1985, D.C. Law 6-100, § 2, 33 D.C. Reg. 781 (1986) (codified at D.C. Code § 6-2901 et seq. (1989 Repl.)). The Council retained civil penalties for such violations. D.C. Law 6-100, § 3, 33 D.C. Reg. at 781-82 (codified at D.C. Code § 6-2902(a)(2) (1989 Repl.)). In 1994, however, the Council enacted the provision at issue in this case, which as previously noted provides civil and criminal penalties for unauthorized disposal of waste. Illegal Dumping Enforcement Act, 41 D.C. Reg. at 525 (now codified as amended at D.C. Code § 8-902). As originally enacted, § 8-902 provided for a maximum penalty, for first offenses, of a fine of $1,000 and imprisonment for sixty days. *Id.* The maximum penalty applicable to first offenses was subsequently increased to a fine of $5,000 and imprisonment for ninety days. Illegal Dumping Enforcement Amendment Act of 1998, D.C. Law 12-90, § 2(b)(2), 45 D.C. Reg. 1308, 1310 (1998); Illegal Dumping Enforcement Amendment Act of 2006, D.C. Law 16-96, § 2(a)(1), 53 D.C. Reg. 1661, 4229 (2006).

In contrast to the abundant evidence of local government regulation of solid-waste disposal in the District of Columbia, information about criminal prosecution is relatively scanty. In 1902, a defendant was convicted of violating the District of

Columbia's waste regulations, in a prosecution conducted by the District of Columbia, and was fined thirty dollars. *Dupont*, 20 App. D.C. at 478-82. We have found three other reported decisions involving criminal prosecutions based on violations of local District of Columbia regulations governing the treatment of waste, and all of those prosecutions were conducted by the District of Columbia. *Darling Del. Corp. v. District of Columbia*, 380 A.2d 596 (D.C. 1977); *Nash v. District of Columbia*, 28 App. D.C. 598 (D.C. Cir. 1907); *Mann v. District of Columbia*, 22 App. D.C. 138 (D.C. Cir. 1903). We have not found any reported decisions involving a criminal prosecution for violating § 8-902.

In sum, the local government of the District of Columbia has regulated solid-waste disposal in the District of Columbia for over 200 years. As far as we have been able to determine from the reported cases, criminal prosecutions for offenses involving solid-waste disposal have historically been conducted by the District of Columbia. These considerations weigh in favor of concluding that the District of Columbia has prosecutorial authority over the instant offense. *In re Hall*, 31 A.3d at 457.

### E. Placement in D.C. Code

The provision at issue in this case was originally codified in Title 6 of the D.C. Code, which at the time was entitled "Health and Safety." D.C. Code § 6-2912 (1995 Repl.). The provision was subsequently recodified in Title 8 of the Code, which is entitled "Environmental and Animal Control and Protection." D.C. Code § 8-902 (2013 Repl.). Codification of the provision in those titles of the Code, rather than in Title 22, which is entitled "Criminal Offenses and Penalties" (2012 Repl.), tends to suggest that the provision is a police or municipal ordinance or regulation rather than a penal statute. *See*, *e.g.*, *In re Hall*, 31 A.3d at 457 ("Consistent with the treatment of firearms regulations as regulatory rather than penal, the UF and UA provisions are codified in Title 7 of the D.C.[ ]Code, which relates to Human Health Care and Safety, rather than in the titles related to criminal law or procedure."); *cf. also McNeely v. United States*, 874 A.2d 371, 390 n.26 (D.C. 2005) ("While not controlling, the Act's codification under Title 6 dealing with Health and Safety is some indication that it is considered regulatory in nature.").

### F. Legislative History of § 8-902

The legislative history of § 8-902 indicates that the District of Columbia Department of Public Works advised the Council of the District of Columbia that criminal prosecutions under § 8-902 would be conducted by the District of Columbia. D.C. Council, Report on Bill 10-249, Attach. F at 3 (June 11, 1993) ("The Corporation Counsel will represent the District before the Superior Court . . . in criminal prosecutions."). The committee report reflects that understanding. Report at 14 (explaining that District of Columbia could arrest violators and enforce provisions of bill). This consideration also supports the conclusion that the charged offense is within the prosecutorial authority of the District of Columbia.

The United States argues, however, that "in deciding questions of prosecutorial authority the Council's intent is irrelevant." We disagree. We held in *In re Crawley* that the Council of the District of Columbia lacks authority to change the criteria established by Congress under § 23-101 to govern the division of prosecutorial authority. 978 A.2d at 620. That does not mean, however, that the Council's intent is irrelevant when we are trying to decide whether a given enactment should be understood as a police or municipal ordinance or regulation or instead

should be understood as a penal statute. We see no reason to ignore such legislative intent in the current context.

### G. Dual Prosecutors under Single Provision

As previously noted, it is undisputed that the United States has prosecutorial authority over felony violations of § 8-902. If the District of Columbia has prosecutorial authority over violations of § 8-902 such as the misdemeanor offense charged in this case, then two different prosecutors will have prosecutorial authority under a single provision. This court has been reluctant to interpret § 23-101 to establish divided prosecutorial authority over a single provision, because of the practical problems such a division of authority can create. *See, e.g.*, *In re Monaghan*, 690 A.2d at 478-79 (where United States concededly had prosecutorial authority over repeat offenses for soliciting for purpose of prostitution, treating prosecution for first offenses as within prosecutorial authority of District could create problems, such as uncertainty as to proper prosecutor based on uncertainty as to whether offense was first offense or repeat offense). This consideration is not dispositive, however. *See In re Hall*, 31 A.3d at 457 n.3 (holding that District of Columbia had prosecutorial authority over first violations of UF and UA statutes even though District of Columbia concededly did not have prosecutorial authority over

prosecution under those provisions for repeat offenses, as to which penalty of over one year of imprisonment was authorized).

## H. Penalties

As this court explained in *In re Hall*, "an offense traditionally enforced by the District as a police regulation may be converted into a penal statute . . . if the Council sufficiently increases the penalty for its violation." 31 A.3d at 456 n.2. The court went on to hold in *In re Hall* that the penalties then applicable to first offenses under the UF and UA provisions -- a fine of up to $1,000, imprisonment of up to one year, or both -- were "not so great as to render these provisions inappropriate for enforcement by the OAG." *Id.*; *see also id.* at 455. In contrast, the court stated in dicta in *In re Crawley* that a statute imposing penalties of a fine of up to $100,000, imprisonment for up to one year, or both, was not "a punishment in the nature of one that would flow from a violation of something akin to a police or municipal ordinance." 978 A.2d at 611 n.3.

The maximum penalty applicable to the instant offense is a fine of up to $5,000 and imprisonment of up to ninety days. D.C. Code § 8-902(b)(2). Although the maximum fine for first offenders thus is $4,000 greater under § 8-902 than under

the UF and UA statutes, the maximum term of imprisonment for first offenders is about nine months less under § 8-902 than under the UF and UA statutes. Considered as a whole, the maximum penalty for first offenses under the UF and UA statutes is significantly harsher than the maximum penalty for the offense alleged in this case. As the Supreme Court explained in a different legal context, "[p]enalties such as probation or a fine may engender a significant infringement of personal freedom . . . , but they cannot approximate in severity the loss of liberty that a prison term entails." *Blanton v. City of N. Las Vegas*, 489 U.S. 538, 542 (1989) (internal quotation marks omitted); *see United States v. Nachtigal*, 507 U.S. 1, 5 (1993) (per curiam) ("While the maximum fine in this case is $4,000 greater than the one in *Blanton*, this monetary penalty cannot approximate in severity the loss of liberty that a prison term entails.") (internal quotation marks omitted).

We therefore conclude that the penalties potentially applicable to the violation of § 8-902 charged in this case are "not so great as to render the[] provision[] inappropriate for enforcement by the OAG." *In re Hall*, 31 A.3d at 456 n.2.

## I.  Balancing Relevant Considerations

We conclude that the balance of relevant considerations supports the conclusion that the District of Columbia has prosecutorial authority over the offense charged in this case.  Specifically, § 8-902 is tied to local conditions rather than an absolute general prohibition; there is a long history of local regulation of solid-waste disposal; prior criminal prosecutions involving such disposal appear to have historically been conducted by the District of Columbia; the offense at issue was not codified in the Title of the D.C. Code devoted to criminal offenses; and the applicable penalties in this case do not exceed those appropriate for enforcement by the District of Columbia.  The only consideration pointing toward the opposite conclusion is the undesirability of having dual prosecutors responsible for prosecutions arising under a single provision.  This overall balance of considerations is in our view not meaningfully distinguishable from the balance of considerations in *In re Hall*, 31 A.3d at 456-58.  We therefore conclude, as we did in *In re Hall*, that the offense at issue is under the prosecutorial authority of the District of Columbia.

We are not persuaded by the remaining arguments to the contrary pressed by the United States.  First, the United States argues that this case is distinguishable

from *In re Hall*, because the UF and UA statutes at issue in *In re Hall* were "direct descendants of," and "substantially similar to," prior police regulations. *In re Hall*, 31 A.3d at 454-55. We did use those phrases in *In re Hall* to describe the relationship of the UF and UA statutes to the prior police regulations, but we did not suggest that those phrases established categorical prerequisites. To the contrary, our emphasis was more broadly on the long history of criminal regulation of firearms and ammunition by the District of Columbia. *See id.* at 453-54 ("Because the District of Columbia long has possessed the authority to regulate the possession of firearms and ammunition, including the authority to punish violations of these regulations with both fines and imprisonment, we hold . . . that the OAG is the proper authority to prosecute the possession of unregistered firearms and unlawful possession of ammunition."), 457 ("The treatment of the UF and UA provisions as regulatory rather than penal in nature comports with the District's long history of firearms regulation.").

Second, the United States points out that, for an eight-year period from 1986 to 1994, no criminal penalties applied to violations of the regulations relating to solid-waste disposal. See *supra* p. 13-14. We do not view that fact as supporting the United States's position. During that eight-year period, solid-waste violations were regulated by the District of Columbia exclusively through civil fines. The

choice of the District of Columbia to experiment for a time with purely civil regulation supports rather than undermines the conclusion that solid-waste disposal has historically been a matter of local regulation rather than general penal prohibition.

Third, the United States argues that § 8-902 is not properly viewed as a police regulation because § 8-902 was enacted by the Council of the District of Columbia and placed in the D.C. Code, rather than being promulgated through the administrative rulemaking process and placed in the D.C. Municipal Regulations. The United States's argument on this point finds some support in dicta from *In re Perrow*, 172 A.3d 894, 901 n.14 (D.C. 2017) (although parties did not raise issue, court indicates in dicta that voyeurism statute "is not a police ordinance or regulation because voyeurism is a D.C. Council enactment, not a pronouncement from the police department"). The United States's argument, however, is squarely contradicted by our holding in *In re Hall* that the UF and UA statutes were "police regulations" within the meaning of § 23-101(a), even though they were enacted as legislation by the Council of the District of Columbia and placed in the D.C. Code. 31 A.3d at 456-57. More generally, the term "regulation" has long and often been applied in the District of Columbia to refer to local enactments by legislative and quasi-legislative entities. *See, e.g.*, *In re Crawley*, 978 A.2d at 612 ("With time, the

Board of Commissioners became more than a mere administrative agency, possessing significant legislative authority obtained by a broad delegation of police power from Congress to promulgate reasonable and usual police regulations.") (internal quotation marks omitted); *cf.*, *e.g.*, D.C. Code §§ 1-206.02(a)(8) (2016 Repl.) (prohibiting Council of District of Columbia from "[e]nact[ing] any . . . regulation" on particular topic), 1-303.03 (Council of District of Columbia may "make" regulations), 47-802(6) (2015 Repl.) (defining "regulation" to include certain acts "enacted" by Council of District of Columbia). Thus, the Council of the District of Columbia has on numerous occasions enacted legislation with provisions to be placed among the District of Columbia Municipal Regulations. *See, e.g.*, Comprehensive Plan Amendment Act of 2006, D.C. Act 16-637, 54 D.C. Reg. 924 (2007) (amending Title 10 of DCMR); Solid Waste Regulations Amendments Act of 1983, D.C. Act 5-37, 30 D.C. Reg. 3331 (1983) (amending, inter alia, 21 DCMR § 703).

In other words, the governmental history of the District of Columbia is inconsistent with applying in the current context a categorical formal distinction between (1) statutes enacted by a legislature and placed in the District of Columbia Code and (2) regulations adopted by administrative agencies and placed in the District of Columbia Municipal Regulations. We do not go so far as to say that such

formal characteristics are irrelevant. We do conclude, however, as we did with respect to the UF and UA provisions at issue in *In re Hall*, that § 8-902's enactment by the Council of the District of Columbia and codification in the D.C. Code does not preclude § 8-902 from being a police or municipal ordinance or regulation within the meaning of § 23-101(a).

Finally, no one in this case has briefed the question whether the applicable penalties under § 8-902 in this case exceed the maximum penalties that the Council of the District of Columbia may impose for violations of regulations. *See* D.C. Code § 1-303.05 (2016 Repl.) (Council of District of Columbia may "prescribe reasonable penalties of a fine not to exceed $300 or imprisonment not to exceed 10 days, in lieu of or in addition to any fine" for violations of regulations promulgated pursuant to D.C. Code §§ 1-303.01, .03, and .04 (2016 Repl.)). We express no view on that question, because we conclude in any event that with respect to the offense charged in this case, § 8-902 could properly be viewed as an ordinance for purposes of § 23-101(a). We do note, however, that § 1-303.05's limitation applies by its terms only to regulations promulgated under certain grants of authority, and the Council of the District of Columbia has had other sources of authority for making regulations. *See, e.g.*, D.C. Code § 1-303.43 (2016 Repl.) (authority to make firearms regulations); D.C. Code § 6-501 (1995 Repl.) (authority to make regulations relating to garbage

and "to annex to said regulations such penalties as will secure the enforcement thereof") (repealed by Sustainable Solid Waste Management Amendment Act of 2014, D.C. Law 20-154, § 301(a), 61 D.C. Reg. 9971, 9988 (2014), 62 D.C. Reg. 3600 (2015)).

For the foregoing reasons, we hold that the offense charged in this case is subject to the prosecutorial authority of the District of Columbia. We therefore remand the case to the Superior Court for further proceedings. *See In re Crawley*, 978 A.2d at 620 n.14 (after court concludes that prosecution had been brought by incorrect prosecutor, court remands case "to allow the trial court to determine in the first instance what should happen next").

*So ordered*.